IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

SHERMAN OSBORN,                               )
                                              )
                    Plaintiff,                )               4:10CV3142
                                              )
         v.                                   )
                                              )
BNSF RAILWAY COMPANY,                         )          MEMORANDUM AND ORDER ON
                                              )          DEFENDANT'S MOTION FOR
                    Defendant.                )          SUMMARY JUDGMENT
                                              )

        Now before me is a motion for summary judgment filed by Defendant BNSF Railway

Company (BNSF)  (ECF No. 25.)  For the following reasons, I shall deny BNSF's motion.


                              I.    BACKGROUND[1]

        The plaintiff, Sherman W. Osborn, became an employee of BNSF on or about August 15,

1994.  (Def.'s Br., Statement of Undisputed Material Facts ("Def.'s Facts") ¶¶ 1-2, ECF No. 26.)

He became a conductor for BNSF on April 9, 1995, and on August 4, 1998, he "was qualified to

work as an engineer."  (Id. ¶ 2.)


_____

        [1] The facts summarized below are taken from the statements of material facts set forth in
the parties' briefs and the evidentiary materials that have been submitted by the defendant.  (See
Def.'s Br. at 2-15, ECF No. 26; Def.'s Indices, ECF Nos. 27-32; Pl.'s Response Br. at 1-4, ECF
No. 40; Def.'s Reply Br. at 1-3, ECF No. 42.)

        I commend counsel for both parties for their concise, well-organized summaries of the
relevant facts and their clear responses to the facts submitted by their opponents.

On March 6, 2002, the plaintiff suffered injuries to his coccyx, ribs, cervical spine, and lumbar spine in a motor vehicle accident.  (Def.'s Facts ¶¶ 3-4.)[2]  The plaintiff was taken off duty at BNSF because of his injuries.  (Id. ¶ 4.)

On or about April 4, 2002, the plaintiff's physician, Raymond Carlson, D.O., submitted to BNSF a Medical Status Form (MSF) stating that the plaintiff was unable to work due to his spinal pain.  (Def.'s Facts ¶ 10; Def.'s Index, Ex. 3, Hr'g Ex. 109, ECF No. 30-1.)  Dr. Carlson's MSF also states that the plaintiff's medication was impairing his "agility and/or mental alertness."  (Def.'s Index, Ex. 3, Hr'g Ex. 109, ECF No. 30-1.)  On or about May 1, 2002, Dr. Carlson completed a second MSF indicating that the plaintiff remained unable to work due to pain in his coccyx and ribs. (Def.'s Facts ¶ 11.)  Like the previous MSF, the May 2002 MSF states that the plaintiff's medication was impairing his agility and mental alertness.  (Id.)

On June 7, 2002, Dr. Carlson completed a third MSF stating that the plaintiff could return to "full duty" status on June 10, 2002.  (Def.'s Index, Ex. 3, Hr'g Ex. 111, ECF No. 30-1.)  Dr. Carlson made his determination that the plaintiff could return to work based on the plaintiff's report that he was feeling better; the doctor did not examine the plaintiff's back before completing the form. (Def.'s Index, Ex. 3, Hr'g Ex. 142 at 16-17, ECF No. 30-1.)

Sometime in June 2002, the plaintiff returned to work at BNSF as either a conductor or engineer, and he made two runs between Alliance, Nebraska, and Edgemont, South Dakota.  (Def.'s Facts ¶ 13.)  After the second run, the plaintiff's back became swollen, and he was unable to get out of bed.  (Id.)  On June 24, 2002, Dr. Carlson completed an MSF stating that the plaintiff was again restricted from duty due to his back pain.  (Id. ¶ 14.)

On or about May 11, 2004, the plaintiff filed a complaint in the District Court of Cheyenne County, Nebraska, against Kathleen and James Jensen.  (Def.'s Facts ¶ 5.  See also Def.'s Index, Ex. 3, Hr'g Ex. 101, ECF No. 28-2.)  In his complaint, the plaintiff alleged that the March 6, 2002, motor

---

[2] The plaintiff was a passenger in a vehicle that was being driven by his brother, Randal Osborn, at the time of the accident.  (Def.'s Facts ¶ 3; Pl.'s Statement of Additional Undisputed Material Facts ("Pl.'s Facts") ¶ 1, ECF No. 40.)  Randal Osborn was also employed by BNSF (see Pl.'s Facts ¶ 1); however, I agree with the defendant that Randal Osborn's injuries, work restrictions, and ability to return to work for BNSF are not material to the defendant's motion for summary judgment, (see Def.'s Reply Br. at 1, ECF No. 42).

vehicle accident was caused by James Jensen's negligence. (See Def.'s Index, Ex. 3, Hr'g Ex. 101 at 1.) He also alleged that due to James Jensen's negligence, the plaintiff would lose "wages, income and employment benefits" in the future and would suffer "future physical impairment and disability," among other things. (Id. at 2.) The plaintiff's case was designated Osborn v. Jensen, No. CI -04-111. (See id. at 1.)

On June 8, 2004, Jeffrey Tyler, PAC, completed an MSF stating that the plaintiff's "recommended work status" was "restricted duty." (Def.'s Index, Ex. 3, Hr'g Ex. 118, ECF No. 30-1.) Among other things, Tyler indicated that the plaintiff was unable to operate vehicles or machinery, was unable to work at unprotected heights, and was limited to occasional lifting of up to twenty pounds. (Id.) On July 9, 2004, BNSF completed a "Fitness for Duty Recommendation" form stating that BNSF would adopt the functional restrictions imposed by Tyler as the "BNSF Approved Restrictions" for the plaintiff. (Def.'s Index, Ex. 3, Hr'g Ex. 119, ECF No. 30-1.) In a letter dated July 14, 2004, BNSF informed the plaintiff that it had "approved" Tyler's restrictions, and that it would determine whether those restrictions could be "accommodated within [the plaintiff's] current job requirements." (Def.'s Index, Ex. 3, Hr'g Ex. 120, ECF No. 30-1.) The letter also states, "If accommodation is not possible, [Field Manager] Angela Bailey will work with you to find another position within your craft and seniority district. If no position can be found, Angela Bailey will work with you to find alternative employment, within BNSF, if possible." (Id.)

In a letter dated August 19, 2004, Angela Bailey informed the plaintiff that "vocational rehabilitation services" were available to him. (Def.'s Index, Ex. 3, Hr'g Ex. 121, ECF No. 30-1.) Her letter also describes the application process for the "First Line Supervisor Assessment Program . . . for union-represented employees interested in moving into an exempt position." (Id.) The plaintiff did not contact Bailey to inquire about vocational rehabilitation services and did not attempt to take the First Line Supervisor Examination. (Def.'s Facts ¶ 18.)[3]

_____

[3] In opposition to the defendant's motion for summary judgment, the plaintiff submits that "Mr. Osborn did not fail to follow-up with [the] railroad's vocational rehabilitation department or other departments; they failed to follow up with him." (Pl.'s Facts ¶ 8.) During an administrative hearing, however, the plaintiff testified that he did not follow up with BNSF "as far as taking the first line supervisor exam" and made no attempts to obtain vocational rehabilitation services from BNSF after the resolution of his lawsuit against the Jensens. (Def.'s

On October 8, 2004, the plaintiff gave his deposition in Osborn v. Jensen. (Def.'s Facts ¶ 6.) He testified that Michael Kaplan, M.D., a physician who had been treating him since May 2003, would not release him to return to work. (Def.'s Facts ¶ 6; Def.'s Index, Ex. 3, Hr'g Ex. 13, ECF No. 28-2; Def.'s Index, Ex. 3, Hr'g Ex. 103 at 50-51, ECF No. 29-1.) The plaintiff also testified, however, that he retained the ability to drive a truck, farm, mow, hunt, and work on home improvement projects. (Def.'s Facts ¶ 6.)

On November 1, 2004, Dr. Kaplan prepared an "Impairment Rating" of the plaintiff. (Def.'s Index, Ex. 3, Hr'g Ex. 13, ECF No. 28-2.) In his rating, Dr. Kaplan wrote that the plaintiff's accident-related injuries had reached maximum medical improvement. (Id. at 3.) He also wrote that he did not expect the plaintiff to be able to return to work for the railroad as a conductor or engineer in the future. (Id. at 3-4.)

On December 29, 2004, Robin Ockey, M.D., who was also one of the plaintiff's treating physicians, evaluated the plaintiff. (Def.'s Facts ¶ 20.) Dr. Ockey opined that because the plaintiff did not want "to consider surgical intervention," he would be at maximum medical improvement after completing "strategies targeting the sacroiliac joint and a brief course of rehabilitation." (Def.'s Index, Ex. 3, Hr'g Ex. 13 at 14, ECF No. 28-2.) Dr. Ockey added that even if the plaintiff's "sacroiliac dysfunction" improved, he would not be able to perform the essential functions of a conductor or engineer. (Id.) Dr. Ockey also suggested that a functional capacity evaluation should be performed when the plaintiff reached maximum medical improvement so that his "overall function" could be better defined. (Id.) In January 2005, Dr. Ockey submitted an MSF to BNSF stating that the plaintiff "had long-term work-restrictions that restricted [him] from operating locomotives." (Def.'s Facts ¶ 20.)

Meanwhile, the plaintiff's case against the Jensens proceeded. (Def.'s Facts ¶¶ 7-8.) On January 24, 2005, John Barker, M.D., an orthopedic surgeon who specializes in spinal injuries, gave his deposition. (Def.'s Facts ¶ 7.) Dr. Barker testified that he treated the plaintiff's accident-related injuries, and he would not release the plaintiff to return to work as a conductor or engineer even if the plaintiff underwent a successful spinal surgery. (Id.) Dr. Ockey gave his deposition on January

Index, Ex. 2 at 223, ECF No. 27-2.)

4

28, 2005, and he too testified that he would not release the plaintiff to return to work as a conductor or as an engineer.  (Def.'s Facts ¶ 8.)

On or about February 1, 2005, Dr. Kaplan completed an MSF stating that the plaintiff was unable to operate a locomotive, walk on uneven surfaces, stoop, bend, twist, climb, or work at unprotected heights.  (Def.'s Index, Ex. 3, Hr'g Ex. 116, ECF No. 30-1.)  The MSF also states that the plaintiff could lift 15 to 20 pounds frequently.  (Id.)

On June 3, 2005, the plaintiff settled his claims against the Jensens for $850,000.  (Def.'s Index, Ex. 3, Hr'g Ex. 102, ECF No. 28-2.)

A note dated April 21, 2006, indicates that BNSF closed the plaintiff's vocational rehabilitation file because "it appears this gentleman is not interested in working with RR opportunities."  (Def.'s Index, Ex. 3, Hr'g Ex. 115 at 9, ECF No. 30-1.)  Sometime in early April 2007, however, the plaintiff informed BNSF that he wanted to return to work as an engineer or conductor.  (Def.'s Facts ¶ 23.)  The plaintiff had been attending physical therapy until his insurance "ran out," and then he continued to do physical therapy exercises at home.  (Pl.'s Facts ¶ 3.)  Through these efforts, the plaintiff was able to improve his condition, and he states that he is now "back to being like [he] was before 2002."  (Def.'s Index, Ex. 2 at 122, ECF No. 27-2.)

On April 5, 2007, BNSF sent a medical questionnaire to the plaintiff in accordance with its "policy for all employees who have been off work due to an off-duty illness or injury."  (Def.'s Facts ¶ 23.)  After reviewing the plaintiff's completed questionnaire and the MSFs submitted previously by Carlson, Ockey, Kaplan and Tyler, Dr. Sharon Clark completed a Fitness for Duty Recommendation form stating that the plaintiff's July 2004 restrictions would be re-issued.  (Id. ¶ 24.)  In a letter to the plaintiff dated April 20, 2007, Dr. Clark itemized these restrictions and invited the plaintiff to submit new medical information dating back to June 2005.  (Id. ¶ 25.)  Dr. Clark suggested that she might alter the plaintiff's restrictions based on this new medical information.  (Def.'s Index, Ex. 3, Hr'g Ex. 3 at 1, ECF No. 28-2.)  She also informed the plaintiff that BNSF would attempt to identify a position where his existing restrictions could be accommodated.  (Id.)

On May 3, 2007, the plaintiff visited Dr. Carlson and advised him of his desire to return to work.  (Def.'s Facts ¶ 26.)  Dr. Carlson then completed an MSF releasing the plaintiff to return to work as a conductor, engineer, or switchman without restrictions.  (Id.; Def.'s Index, Ex. 3, Hr'g Ex.

27, ECF No. 28-2.)  Dr. Carlson did not examine the plaintiff when issuing the release, and instead based the release on the plaintiff's "self-report" that he was doing better.  (Def.'s Index, Ex. 3, Hr'g Ex. 142 at 60-61, ECF No. 30-1.)  Indeed, the MSF states, "None," under the heading, "Current Objective Findings and Response to Treatment."  (Def.'s Index, Ex. 3, Hr'g Ex. 27.)  Dr. Carlson expected BNSF to examine the plaintiff and determine whether he would be able to work.  (Def.'s Index, Ex. 3, Hr'g Ex. 142 at 61-62.)

After receiving the May 2007 MSF from Dr. Carlson, Dr. Clark asked a colleague to advise the plaintiff that "medical evidence and objective tests were needed."  (Def.'s Facts ¶ 27.)  On May 10, 2007, Yvonne Garber, who worked in BNSF's Mental Health Division, informed the plaintiff via voicemail that BNSF would not allow the plaintiff to return to work as an engineer or conductor without supporting "medical documentation."  (Id. ¶ 28.)  The plaintiff called Garber on June 7, 2007, and was told that his medical documentation must "include medical notes and/or tests which supported releasing [him] to return to work without restrictions."  (Id.)  On June 8, 2007, the plaintiff contacted Dr. Carlson's office and asked that his records be forwarded to BNSF.  (Id. ¶ 29; Def.'s Index, Ex. 3, Hr'g Ex. 126, ECF No. 30-1.)

Sometime in June 2007, BNSF received a copy of a medical note from Dr. Carlson's office.  (Def.'s Facts ¶ 30.)  The note did not bear the plaintiff's name, but Dr. Clark inferred that it concerned the plaintiff because it was accompanied by "an incomplete release with Osborn's name on it."  (Id.)  The medical note stated that there had been an assessment of spine trauma, that the patient could return to work, and that some unspecified paperwork had been filled out (or needed to be filled out).[4]  (Id.; Def.'s Index, Ex. 3, Hr'g Ex. 126.)

On June 19, 2007, the plaintiff injured his right elbow while farming.  (Def.'s Facts ¶ 35.)  A Dr. Simpson performed diagnostic surgery on the elbow, and the plaintiff wore a cast on it for three to five days.  (Id.)  He also filled prescriptions for pain medication on June 23 and June 29, 2007.  (Id.)  He did not inform Dr. Clark of this injury.  (Def.'s Index, Ex. 2, Tr. at 293-94, ECF No. 27-2.)

---

[4] The note is not clear on this point.

6

On July 6, 2007, Dr. Clark received an email from Randy Knutson, General Chairman of the United Transportation Union, inquiring about the delay in the plaintiff's return to work.  (Def.'s Facts ¶ 31; Def.'s Index, Ex. 3, Hr'g Ex. 127 at 3-4, ECF No. 30-1.)  In response, Dr. Clark sent Knutson an outline of the status and history of the plaintiff's case, and she informed Knutson that "[t]o remove [the plaintiff's] currently existing restrictions, the medical evidence would have to be just as stringent as that which precipitated his disability rating and permanent impairment."  (Def.'s Facts ¶ 31; Def.'s Index, Ex. 3, Hr'g Ex. 127 at 3.)

Sometime after July 6, 2007, the plaintiff sent Dr. Clark an undated letter that included descriptions of exercises that had been given to him by a physical therapist.  (Def.'s Index, Ex. 3, Hr'g Ex. 4, ECF No. 28-2.)  Dr. Clark did not deem this information to be sufficient to justify lifting the plaintiff's restrictions.  (Def.'s Facts ¶ 32.)

On February 21, 2008, Laren Roper, M.S., OTR., performed a functional capacity evaluation of the plaintiff.  (Def.'s Index, Ex. 3, Hr'g Ex. 28, ECF No. 28-2.)[5]  Roper concluded that the plaintiff could return to work as a conductor or engineer for BNSF without restrictions.  (Pl.'s Facts ¶ 5.)  Roper's evaluation was submitted to BNSF, and Dr. Clark reviewed it on or about March 28, 2008.  (Def.'s Facts ¶ 33-34.)  Although the evaluation indicated that the plaintiff had "a normal functional capacity," Dr. Clark did not deem it sufficient to warrant the removal of the plaintiff's restrictions.  (Def.'s Index, Ex. 2, Tr. at 295, ECF No. 27-2.)  Citing Dr. Ockey's 2004 opinion, Dr. Clark maintained that even if the plaintiff "were to regain full functionality, the nature of his sacroiliac injury put[s] him at increased risk [for injury] if he were allowed to return to work to his conductor/engineer duties, and . . . he should not return to those duties."  (Id.; see also id. at 315.)[6]  She also said that she cannot think of anything that the plaintiff could produce that would convince her to eliminate the 2004 restrictions.  (Id. at 315-16.)  Dr. Clark admitted, however, that Roper's

---

[5] The plaintiff states that he did not discuss his June 2007 elbow injury with Roper during this evaluation.  (Def.'s Index, Ex. 2, Tr. at 230, ECF No. 27-2.)

[6] As I noted previously, however, Dr. Ockey also stated in 2004 that the plaintiff would not reach maximum medical improvement until he completed rehabilitation and that a functional capacity evaluation should then be performed so that his "overall function" could be better defined.  (Def.'s Index, Ex. 3, Hr'g Ex. 13 at 14, ECF No. 28-2.)

7

functional capacity evaluation not only shows "somebody that has restored function," but also "that Mr. Osborn functionally would be able to perform the job of an engineer" or of a conductor. (Id. at 305.) In addition, she stated that the content of Roper's evaluation should not be discounted simply because it was not reviewed by one of the plaintiff's medical providers. (Id. at 305-06.)

On or about May 27, 2008, the plaintiff filed a charge of discrimination with the Nebraska Equal Opportunity Commission (NEOC) and the EEOC alleging that BNSF discriminated against him based on "a record of and perceived disability." (Def.'s Index, Ex. 3, Hr'g Ex. 8, ECF No. 28-2.) On July 30, 2009, an administrative hearing was held before an NEOC hearing examiner in Box Butte County, Nebraska. (Def.'s Index, Ex. 2, Tr. at 1.) During the hearing, the plaintiff testified that since the March 2002 accident he has farmed, driven and maintained a semi-tractor and trailer, lifted 20- to 40-pound bags of seeds, hunted, built a deck, and installed a fence, among other things. (Def.'s Facts ¶ 40.)

On March 2, 2010, the hearing examiner recommended to the NEOC that the plaintiff's complaint be dismissed because the "[c]omplainant failed to prove a prima facie case of intentional discrimination on the basis of disability (perceived) by a preponderance of the evidence." (Def.'s Index, Ex. 5 at 7-8, ECF No. 32-3.) On March 19, 2010, the NEOC determined that the hearing examiner's recommended order and decision would be "the official Final Order of the Nebraska Equal Opportunity Commission." (Def.'s Index, Ex. 6, ECF No. 32-4.) The plaintiff filed a petition for review of the NEOC's decision in the District Court of Box Butte County, Nebraska, on April 16, 2010. (Def.'s Facts ¶ 42.) On September 17, 2010, however, the plaintiff dismissed the petition for review. (Id.)

On April 29, 2010, the EEOC closed its file on the plaintiff's EEOC charge, stating that it "adopted the findings of the state . . . fair employment practices agency that investigated this charge." (Def.'s Index, Ex. 9, ECF No. 32-7.) The EEOC advised the plaintiff of his "right to sue based on this charge." (Id.)

On July 21, 2010, the plaintiff filed a complaint against BNSF in this court, and on July 22, 2010, the plaintiff filed an amended complaint. (ECF Nos. 1, 5.) In his amended complaint, the plaintiff alleges that the defendant discriminated against him in violation of the Americans With Disabilities Act of 1990 (ADA), 42 U.S.C. §§ 12101 et seq. (See generally id.)

8

On January 4, 2011, Dr. Kaplan examined the plaintiff and completed an MSF stating that the plaintiff could return to work without restrictions.  (Def.'s Facts ¶ 44.)  Dr. Kaplan based his findings on Roper's functional capacity evaluation and the fact that the plaintiff had no symptoms of lower back pain.  (Id.; see also Def.'s Index, Ex. 10, ECF No. 32-8.)  Dr. Kaplan noted that the plaintiff "has actually started a trucking company and is doing plenty of work driving large rigs with bouncing, jostling, and exertion," and "[h]e is tolerating that."  (Pl.'s Index, Ex. 15 at 2, ECF No. 38-3.)  He also noted, "It is excellent that [Osborn] has done well sticking through on a conservative program with sequential improvement/resolution."  (Id.)  After examining the plaintiff, Dr. Kaplan prepared a report stating,

> This patient is pain free now, and has a Functional Capacity Evaluation that objectively demonstrated in 2008 that he is capable of returning to work with no restrictions.  I have rated him in the past in the setting of his chronic discogenic lower back pain, but at this time it is not apparent that he has symptoms, there is no evidence for radiculopathy, and he is functionally working and capable.  I have no objection to him returning to work at the railroad.

(Id. at 3.)

On January 14, 2011, the defendant filed the instant motion for summary judgment.  (ECF No. 25.)

On April 8, 2011, well after the briefing of the defendant's summary judgment motion was closed, the plaintiff submitted for my consideration a deposition of Dr. Kaplan that was taken on March 29, 2011.  (ECF No. 47.)  The plaintiff has not directed me to consider any particular page or line of this deposition, which spans approximately 70 pages.  Instead, he states, "This deposition was not available on the date that Plaintiff initially responded to Defendant's motion for summary judgment and goes to the issue of Plaintiff's evidence supporting the issue of Plaintiff's ability to perform the essential job functions of the job of engineer or conductor." (Pl.'s Supp. Index, ECF No. 47.)  I appreciate the fact that this deposition was not available when the plaintiff filed its brief in opposition to the defendant's summary judgment motion; however, I shall not read through the entire deposition and search for ways in which it might bear upon matters addressed in the plaintiff's brief.  See NECivR 7.0.1(b)(2)(A); NECivR 56.1(b)(1).  The defendant has moved to strike the plaintiff's submission, (ECF No. 48), and this motion will be granted.

9

## II.    STANDARD OF REVIEW

A motion for summary judgment shall be granted by the court "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one that "might affect the outcome of the suit under the governing law," and a genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). See also Haigh v. Gelita USA, Inc., 632 F.3d 464, 468 (8th Cir. 2011). In determining whether a genuine issue of material fact exists, the evidence is to be taken in the light most favorable to the nonmoving party. Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970); Haigh, 632 F.3d at 468.


## III.    ANALYSIS

The defendant argues that it is entitled to summary judgment because 1) "BNSF did not regard Osborn as being disabled within the meaning of the ADA"; 2) "Osborn is not qualified to perform the essential functions of the positions of engineer or conductor"; 3) "BNSF had a legitimate business reason for refusing to allow Osborn to return to work"; 4) "Osborn failed to exhaust his administrative remedies as to his claims that BNSF failed to provide him with a reasonable accommodation and BNSF failed to engage in the interactive process;" 5) "[t]here is no legal obligation to provide a reasonable accommodation for a perceived disability"; and 6) "Osborn's claims are barred by the doctrines of judicial estoppel and equitable estoppel." (Def.'s Br. at 16, ECF No. 26.) In response to the defendant's motion, the plaintiff states that his "position is that [he] can perform the job of engineer and conductor without any accommodations," and he "withdraws any reasonable accommodation claims." (Pl.'s Br. at 10, ECF No. 40.) I find, therefore, that the plaintiff has no viable "reasonable accommodation" claims, and that the defendant's fourth and fifth arguments are moot. I shall analyze each of the defendant's remaining arguments in turn.

10

**A.     Whether the Defendant Regarded the Plaintiff as Disabled Within the Meaning of the
ADA**

"A plaintiff seeking to recover under the ADA must establish a prima facie case of
discrimination, that is: 'a disability within the meaning of the ADA; qualifications to perform the
essential functions of the job, with or without reasonable accommodation; and an adverse
employment action due to a disability.'" Duello v. Buchanana County Bd. of Supervisors, 628 F.3d
968, 972 (8th Cir. 2010) (quoting Wenzel v. Missouri–American Water Co., 404 F.3d 1038, 1040
(8th Cir. 2005)).  A "disability within the meaning of the ADA" is defined as  "(A) a physical or
mental impairment that substantially limits one or more of the major life activities of [an] individual;
(B) a record of such an impairment; or (C) being regarded as having such an impairment."  Id.
(quoting Kozisek v. County of Seward, Neb., 539 F.3d 930, 934 (8th Cir. 2008)).  In this case, the
plaintiff alleges that he is disabled within the meaning of the ADA because the defendant regarded
him as having a substantially-limiting impairment.  (See Am. Compl. ¶¶ 17-18, ECF No. 5.)  The
defendant argues, however, that there is no genuine issue of material fact, and the plaintiff cannot
show that BNSF regarded him as disabled.  (Def.'s Br. at 17-26.)  I disagree with the defendant.

As noted above, "[b]eing 'regarded as' having a physical or mental impairment that
substantially limits one or more of an individual's major life activities qualifies as a disability under
the ADA." Pittari v. American Eagle Airlines, Inc., 468 F.3d 1056, 1061 (8th Cir. 2006) (citing 42
U.S.C. § 12102(2)(C)).[7]  "There are two apparent ways in which individuals may fall within this
statutory definition: (1) a covered entity mistakenly believes that a person has a physical impairment
that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes
that an actual, nonlimiting impairment substantially limits one or more major life activities." Sutton
v. United Air Lines, Inc., 527 U.S. 471, 489 (1999).  See also Pittari, 468 F.3d at 1061.  "In both
cases, it is necessary that a covered entity entertain misperceptions about the individual—it must
believe either that one has a substantially limiting impairment that one does not have or that one has
a substantially limiting impairment when, in fact, the impairment is not so limiting." Sutton, 527

_____

[7] This section of the ADA was recently amended.  See ADA Amendments Act of 2008
(ADAAA), Pub. L. No. 110-325, § 4.  In Pitrari, the Eighth Circuit applied the pre-amendment
version of the ADA.  The ADAAA will be discussed in more detail below.

U.S. at 489.  "These misperceptions often 'resul[t] from stereotypic assumptions not truly indicative of . . . individual ability.'"  Id. (citation omitted).

Preliminarily, I note that the legal framework set forth in Sutton v. United Air Lines, Inc., 527 U.S. 471 (1999), and Toyota Motor Manufacturing, Kentucky, Inc. v. Williams, 534 U.S. 184 (2002), which I have summarized above and which the defendant relies upon in its summary judgment brief, (see Def.'s Br. at 17-19, 24-25), was recently overruled by Congress.  In the ADA Amendments Act of 2008 (ADAAA), Pub. L. No. 110-325 (2008), Congress criticized Sutton and Williams, declaring that the cases "narrowed the broad scope of protection intended to be afforded by the ADA."  Pub. L. No. 110-325, § 2(a).   In particular, Congress specifically "reject[ed] the Supreme Court's reasoning in Sutton . . . with regard to the coverage under the third prong  of the definition of disability [(i.e., the "regarded as" prong)] and . . . reinstate[d] the reasoning of the Supreme Court in School Board of Nassau County v. Arline, 480 U.S. 273 (1987) which set forth a broad view of the third prong of the definition of handicap under the Rehabilitation Act of 1973." Pub. L. 110-325, § 2(b)(3).   See also Arline, 480 U.S. at 284 ("By amending the definition of 'handicapped individual' to include not only those who are actually physically impaired, but also those who are regarded as impaired and who, as a result, are substantially limited in a major life activity, Congress acknowledged that society's accumulated myths and fears about disability and disease are as handicapping as are the physical limitations that flow from actual impairment.").  As amended by the ADAAA, section 3 of the ADA now states,

> An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.

42 U.S.C. § 12102(3)(A) (emphasis added).  This amendment went into effect on January 1, 2009, see Pub. L. No. 110-325, § 8, which predates the filing of the instant complaint, (see ECF No. 1). It appears, however, that every circuit that has considered the issue–including the Eighth Circuit–has found that the ADAAA amendments do not apply retroactively to govern conduct that occurred before the Act's effective date.  See Nyrop v. Independent School Dist. No. 11, 616 F.3d 728, 734 n.4 (8th Cir. 2010) (citing cases).  Thus, I find the principles set forth by the Supreme Court in

Sutton govern this case: the plaintiff must show that the defendant believed either that the plaintiff had a substantially limiting impairment that he did not have, or that the plaintiff had a substantially limiting impairment when, in fact, his impairment was not substantially limiting.  See Sutton, 527 U.S. at 489.[8]

The plaintiff argues that BNSF regarded him as having an impairment that substantially limited his ability to work and to lift.  (Pl.'s Br. at 6.)  "In order to be regarded as disabled with respect to the major life activity of working, the employer must mistakenly believe that the actual impairment substantially limits the employee's ability to work."  Chalfant v. Titan Distribution, Inc., 475 F.3d 982, 989 (8th Cir. 2007).  "A substantial limitation is present only when the employee is significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes."  Id. (citation and quotation marks omitted).  "The factors to be considered include: the number and type of jobs from which the impaired individual is disqualified; the geographical area to which the individual has reasonable access; and the individual's job training, experience, and expectations."  Fjellestad v. Pizza Hut of America, Inc., 188 F.3d 944, 949 (8th Cir. 1999).  "If an employer believes that an employee is unable to perform 'one specific job,' then the employee is not regarded as disabled."  Chalfant, 475 F.3d at 989 (citation omitted).  Indeed, "[a]n impairment that disqualifies a person from only a narrow range of jobs is not considered a substantially limiting one."  Pittari v. American Eagle Airlines, Inc., 468 F.3d 1056, 1062 (8th Cir. 2006) (emphasis added).

There is no dispute that the defendant believed that the plaintiff could not perform the jobs of engineer or conductor.  The plaintiff does not argue, however, that these two positions, taken together, qualify as a "class of jobs or broad range of jobs in various classes."  Chalfant, 475 F.3d 989.  Instead, the plaintiff argues that the job restrictions imposed upon him by BNSF show that BNSF regarded him as unable to perform the jobs of conductor, engineer, switchman, brakeman, or any other job "that does not fit in the light category."  (Pl.'s Br. at 7.)  The plaintiff adds that his perceived disability disqualifies him from a broad range of jobs in various classes because BNSF's 20-pound lifting restriction translates to many different jobs.  (Id. at 7-8.)

---

[8] It merits mention that neither party has argued that the ADAAA is applicable in this case.

13

In support of his argument that the defendant regarded him as unable to work in any job other than a "light" one, the plaintiff refers me to Dr. Clark's testimony during the NEOC hearing, wherein she stated that the plaintiff's continuing restrictions would limit him to "light to medium" work, adding that he was limited to "mostly light" work "because of the lifting restriction." (Def.'s Ex. 2, Tr. at 319-320.)  In addition, he cites a "Preliminary Vocational Report" dated January 11, 2005, by Jack Greene, M.Ed., CRC, PLC, which states that Dr. Ockey's restrictions would place the plaintiff "at approximately the light level, or below, due primarily due to his material handling limitation of occasional lifting up to 20 pounds, along with his other documented limitations." (Pl.'s Index, Ex. 16, Hr'g Ex. 108 at 11, ECF No. 38-4.)  Greene's report also states that the plaintiff's "past employment activities have been primarily at the heavy and medium work level," and that the plaintiff will not be able to return to those jobs given the limitations imposed by Dr. Ockey and others.  (Id. at 12.)

Based on this evidence, a reasonable jury could conclude that the defendant believed that the plaintiff had an impairment that substantially limited his ability to work in either a broad class of jobs or a broad range of jobs in various classes.  See 29 C.F.R. § 1630.2(j)(3) (listing factors to be considered when determining whether a person is disqualified from a class of jobs or a broad range of jobs in various classes).  See also Webner v. Titan Dist., Inc., 267 F.3d 828, 834 (8th Cir. 2001) (holding that lifting restrictions that eliminated heavy and very heavy work "can translate across a broad spectrum of physically demanding jobs").

The defendant argues that "[t]he only recommended restrictions BNSF received from Osborn's physicians related to the positions of locomotive engineer or conductor," and that "[t]here is no evidence that BNSF considered Osborn for any other position because Osborn never applied for any other positions with BNSF." (Def.'s Reply Br. at 3, ECF No. 42.)  It is true that BNSF's restrictions relate to the positions of engineer and conductor, and there is no evidence that BNSF considered the plaintiff for any other position.  Dr. Clark's testimony shows, however, that BNSF's restrictions relate to a broad range of positions–not just the positions of engineer or conductor–because the restrictions (according to Dr. Clark) would limit the plaintiff to "mostly light" work.  A reasonable jury could find, therefore, that the defendant regarded the plaintiff as

substantially limited in his ability to work, even though he did not seek positions at BNSF apart from the conductor or engineer position.

The defendant also argues that Greene's report is irrelevant "to a determination of whether BNSF perceived Osborn as being disabled" because his "records were never shared with BNSF," and because "Greene also had additional physical limitations that Osborn self-reported to him that were not reported to BNSF." (Def.'s Reply Br. at 3.) It seems to me, however, that Greene's report is relevant to the question of whether the restrictions imposed upon the plaintiff by the defendant would substantially limit the plaintiff's ability to work in a wide array of jobs.

The defendant argues that its "perceptions" about the plaintiff's ability to work "were not based on misconceptions" about the plaintiff's abilities, "but on Osborn's own physician's recommendations." (Def.'s Reply Br. at 4.) While it is true that the original restrictions were based on the recommendations of the plaintiff's physician in approximately 2004, the plaintiff has since come forward with evidence showing that those restrictions are no longer applicable to him. Indeed, Dr. Clark acknowledged that there is evidence showing that the plaintiff can now perform the functions of an engineer or conductor; also, the defendant states in its summary judgment brief that "Osborn's ability to work as a truck driver and farmer and perform the routine maintenance on the semi-truck and trailer and farm equipment is <u>indicative of the fact that he is capable of doing similar work to that of a conductor or engineer</u>." (Def.'s Br. at 23 (emphasis added).) Furthermore, Dr. Clark has said that the plaintiff could come forward with no medical evidence that would convince her to eliminate the 2004 restrictions. These facts undermine the defendant's argument that it continues to maintain the 2004 restrictions based solely on the medical evidence, and a reasonable jury could conclude that the defendant denied the plaintiff employment based on misconceptions about the plaintiff's abilities.

Relatedly, the defendant argues that it is merely "relying on the fact that Dr. Ockey indicated that no matter what Osborn did to recover from his injuries, he could not return to work at BNSF as a locomotive engineer or conductor because of the risk of reinjury." (Def.'s Reply Br. at 4.) Dr. Ockey did believe that the restrictions he imposed upon the plaintiff would be permanent and that the plaintiff would never be released to return to work at the railroad. The defendant's continued reliance on his 2004 opinions is questionable, however, in light of the fact that Dr. Clark now

15

concedes that there is evidence that the plaintiff has "restored function" and "functionally would be able to perform the job" of an engineer or conductor.

Citing Conant v. City of Hibbing, 271 F.3d 782, 785 (8th Cir. 2001), for the propositions that 1) "[t]here is a distinction between being regarded as an individual unqualified for a particular job because of a limiting physical impairment and being regarded as 'disabled' within the meaning of the ADA," and 2) "an employer is free to decide that . . . some limiting, but not substantially limiting, impairments make individuals less than ideally suited for a particular job," the defendant submits that summary judgment is in order because here, as in Conant, the plaintiff was only regarded as being unsuited for two particular jobs.  (See Def.'s Br. at 23-24.)  Unlike in Conant, however, where "the record [was] bereft of any evidence indicating that the City perceived Conant as anything more than unable to perform [a] particular job," here there is evidence that the defendant perceived the plaintiff to be limited to "mostly light" work.  Conant is therefore distinguishable.

Finally, citing EEOC v. Schneider National, Inc., 481 F.3d 507, 509-511 (7th Cir. 2007), the defendant argues that it is "not required to assume the risk of reinjury to Osborn that Dr. Ockey predicted would occur if he returned to work on locomotives."  (Def.'s Br. at 25-26.)  In Schneider National, there was "no evidence that [the defendant] considered [the plaintiff's condition] to impair any 'life activity' other than driving a truck for Schneider, and perhaps for some other truck companies . . . that like Schneider have safety standards higher than the minimum required by the federal government."  481 F.3d at 511.  The court found that this "is too esoteric a capability to be judged a major life activity."  Id.  Here, however, there is evidence showing that BNSF believed Osborn to have a condition that would disable him from working in a broad range of jobs (i.e., most work above the "light" category).  This sort of evidence seems to have been lacking in Schneider National, and therefore I find that the case is distinguishable.

The trier of fact may well agree with the defendant that BNSF only regarded the plaintiff as being unable to perform the particular positions of conductor and engineer.  It might also agree that the defendant's invitations to the plaintiff to apply for other positions or to submit an application for the first-line supervisor assessment program demonstrate that BNSF did not regard the plaintiff to be substantially limited in working.  (See Def.'s Br. at 20-22.)  I am not persuaded, however, that

16

no reasonable trier of fact could conclude that the defendant perceived the plaintiff to be substantially limited in his ability to work.

**B.  Whether the Plaintiff is Qualified to Perform the Essential Functions of an Engineer or Conductor**

The defendant argues next that summary judgment is in order because the plaintiff is not qualified to perform the essential functions of an engineer or conductor.  (Def.'s Br. at 27.)

As noted in Part III.A. above, the plaintiff cannot recover under the ADA unless he shows that he has "qualifications to perform the essential functions of the job."  Duello v. Buchanana County Bd. of Supervisors, 628 F.3d 968, 972 (8th Cir. 2010).  "To make a prima facie showing that he is qualified for the job, [a plaintiff] must demonstrate that he meets the essential prerequisites for the job, such as basic education, experience and training, and that he can perform the essential functions of the job . . . ."  Id. (quoting Kammuller v. Loomis, Fargo & Co., 383 F.3d 779, 786 (8th Cir. 2004)).[9]  In this case, there is no dispute that the plaintiff met "the essential prerequisites" for the jobs of conductor and engineer.  The defendant argues, however, that the plaintiff cannot show that he could perform the essential functions of the jobs.  (See Def.'s Br. at 27-32.)

Preliminarily, I note that "whether a plaintiff is qualified is measured at the time of the adverse employment action, even if the plaintiff is likely to recover in a relatively short period of time."  Id. (citing Browning v. Liberty Mut. Ins. Co., 178 F.3d 1043, 1048 (8th Cir. 1999)).  In this case, the alleged adverse employment action is the defendant's refusal to rehire the plaintiff after he sought to return to BNSF in April 2007.  Although there is no dispute that the defendant has refused to rehire the plaintiff, neither party attaches a specific date to the defendant's refusal.  The defendant submits, however, that the relevant date necessarily precedes May 22, 2008, when the plaintiff filed

---

[9] In some cases, a plaintiff can satisfy the latter component of this showing by demonstrating that he "can perform the essential functions of the job with or without accommodation."  Duello, 628 F.3d at 972 (emphasis added).  In "regarded as" cases such as the instant one, however, "plaintiffs are not entitled to reasonable accommodations because the ADA was not intended to grant reasonable accommodations to those who are not actually disabled."  Id. (citing Weber v. Strippit, Inc., 186 F.3d 907, 917 (8th Cir. 1999)).  See also id. at 973 n.3 (discussing the implications of the ADAAA for the Eighth Circuit's holding in Weber).  Therefore, in order to establish that he was qualified to perform the jobs of engineer or conductor, the plaintiff must show that he could perform the essential functions of those jobs without reasonable accommodations.

his charge of discrimination.  (See Def.'s Br. at 29; see also Def.'s Index, Ex. 3, Hr'g Ex. 8, ECF No. 28-2 (indicating that the defendant's charge of discrimination was signed on May 22, 2008, and was received by the Lincoln Office of the NEOC on May 27, 2008).)  I agree with the defendant, and I find that evidence that was not available to BNSF before May 22, 2008, is irrelevant to the question of whether the plaintiff was qualified.

In support of its argument, the defendant submits that during the relevant time frame, BNSF possessed medical opinions from several of the plaintiff's treating physicians stating that Osborn could not–and likely could never–return to work as a conductor or engineer; Dr. Carlson's May 2007 MSF, which "was based on no objective findings at all"; and Roper's February 2008 functional capacity evaluation, which, according to the defendant, was inadequate because it does not constitute "medical evidence."  (Def.'s Br. at 27-30.)  The defendant asserts that, based solely on this evidence, the plaintiff cannot show that he was qualified to work as an engineer or conductor for BNSF.   In response, the plaintiff argues that Roper's functional capacity evaluation is "valid, reliable, and usually accepted," and cannot be ignored.  (Pl.'s Br. at 10.)

Setting aside Dr. Carlson's May 2007 MSF,[10] the key question is whether the 2008 functional capacity evaluation can support a finding that Osborn could perform the essential functions of an engineer or conductor, even though a body of medical evidence from 2002 through 2005 strongly suggests otherwise.  The 2008 functional capacity evaluation clearly indicates that, according to Roper, the plaintiff was capable of performing heavy work; furthermore, Dr. Clark has indicated that Roper's evaluation showed "that Mr. Osborn functionally would be able to perform" the jobs of an engineer or conductor and that he has "restored function"–although she also believed that the plaintiff continued to be "at increased risk [for injury] if he were allowed to return to work" as a conductor or engineer. (Def.'s Index, Ex. 2, Tr. at 295, 305, ECF No. 27-2.)  Significantly, Dr. Carlson also stated that the fact that the 2008 functional capacity evaluation was not reviewed by one of Osborn's medical providers would not "be a reason to discount the content."  (Def.'s Index, Ex. 2, Tr. at 305-06, ECF No. 27-2.)  It seems to me that a reasonable factfinder could conclude, based on Roper's functional capacity evaluation and Dr. Carlson's testimony, that the plaintiff could

---

[10] The plaintiff does not argue that Dr. Carlson's 2007 MSF supports a finding that Osborn was qualified to return to work as an engineer or conductor.  (See Pl.'s Br. at 10.)

18

perform the essential functions of an engineer or conductor at the time when the defendant refused to rehire him.

Citing Bass v. SBC Communications, Inc., 418 F.3d 870 (8th Cir. 2005), the defendant implies that the plaintiff cannot establish a prima facie case in the absence of a release from one of his physicians. (Def.'s Br. at 27.) In Bass, the defendant presented findings from its physician indicating that Bass was unable to return to work, and in response, Bass "relied solely on his own statements that he could have returned to work." 418 F.3d at 873. The Eighth Circuit held that Bass's statements were "insufficient to avoid summary judgment." Id. The court also noted that Bass's statements were contradicted by his own deposition testimony and that Bass produced no evidence to support his contention that his personal physician had released him to return to work. Id. at 873-74. I am not persuaded that Bass stands for the proposition that a plaintiff cannot establish that he is qualified to return to work without producing a physician's release.[11] Moreover, although Osborn has stated that he has fully recovered from his injuries, he does not rely solely on his own statements in opposition to the defendant's motion for summary judgment. In short, Bass is plainly distinguishable from the instant case, and it does not support the granting of summary judgment in the defendant's favor.

The defendant also argues that I should "give substantial weight to the final findings and order made by the NEOC." (Def.'s Br. at 31.) The defendant adds, "The NEOC specifically found that Osborn had failed to prove a prima facie case because he failed to prove that he was qualified to perform the essential functions of the position of engineer and conductor because of the restrictions placed upon him by his physicians in 2004 and he failed to produce credible evidence that these restrictions were no longer valid." (Id. at 32.) The NEOC did not rule summarily against the plaintiff, however. As the defendant notes, "[t]he NEOC had a contested hearing that lasted for a day," and the plaintiff "was allowed to fully and fairly litigate the issue before the NEOC." (Id. at 31-32.) In ruling on the instant motion for summary judgment, it is not my function to make credibility findings or weigh the evidence (as the NEOC has done). Rather, I must determine whether there are disputed issues of material fact and whether the defendant is entitled to judgment

---

[11] It merits mention that Osborn did, in fact, obtain a release from his treating physician, though it is quite true that the release was not supported by "objective findings."

as a matter of law.  I find that the NEOC's findings of fact and conclusions of law are entitled to no weight here.  Cf. University of Tennessee v. Elliot, 478 U.S. 788 (1986).  Furthermore, I find that the question of whether the plaintiff was qualified for either of the relevant positions remains to be resolved at trial.

### C.   Whether the Defendant had a Legitimate Business Reason for Refusing to Allow the Plaintiff to Return to Work

The defendant argues that, even if the plaintiff is able to establish a prima facie case of discrimination, summary judgment is nevertheless proper because the defendant had a legitimate, nondiscriminatory reason for not rehiring the plaintiff.  (See Def.'s Br. at 16-17 (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)); id. at 32.)  Specifically, the defendant argues that it did not rehire the plaintiff because he "failed to provide BNSF with credible evidence that his physicians believed that he was fit to work again and that there was no longer a risk of reinjury if he returned to work."  (Def.'s Br. at 32.)  The defendant's argument is skeletal, and it is undermined by Dr. Clark's testimony that she could think of nothing that Osborn could produce that would cause her to eliminate his 2004 restrictions.  (Def.'s Index, Ex. 2, Tr. at 315-16, ECF No. 27-2.)  I am not persuaded that the defendant is entitled to summary judgment on the ground that it had legitimate business reasons for refusing to rehire the plaintiff.

### D.   Whether the Plaintiff's Claim Is Barred Under the Doctrine of Judicial Estoppel

The doctrine of judicial estoppel protects the integrity of the judicial process "by prohibiting parties from deliberately changing positions according to the exigencies of the moment."  New Hampshire v. Maine, 532 U.S. 742, 749-50 (2001) (citations and internal quotation marks omitted).  There is no definitive set of factors that governs whether judicial estoppel must be applied.  Id. at 750.  Three factors are typically considered, however.  "First, a party's later position must be 'clearly inconsistent' with its earlier position."  Id.  "Second, courts typically inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create 'the perception that either the first or the second court was misled.'"  Id. (quoting Edwards v. Aetna Life Ins. Co., 690 F.2d 595, 598 (6th Cir. 1982)).  "Absent success in a prior proceeding, a party's later inconsistent position introduces no 'risk of inconsistent court determinations,' and thus poses little threat to judicial integrity."  Id. at 750-51 (citations omitted).  "A third consideration is whether the party seeking to assert an

20

inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."  Id. at 751.  Judicial estoppel "is an equitable doctrine invoked by a court at its discretion," id. at 750 (citation omitted), and I note in passing that the Tenth Circuit has rejected the doctrine entirely, see Chrysler Credit Corp. v. Country Chrysler, Inc., 928 F.2d 1509, 1521 n.10 (10th Cir. 1991).  The doctrine is viable in the Eighth Circuit, however.  See, e.g., Capella University, Inc. v. Executive Risk Specialty Ins. Co., 617 F.3d 1040, 1051 (8th Cir. 2010).

There appears to be no dispute that the plaintiff took a position in Osborn v. Jensen, No. CI-04-111, that is inconsistent from the position that he has taken in this case.  (See Pl.'s Br. at 11-12.)  As noted above in Part I, the plaintiff submitted evidence in Jensen indicating that he would never be released to return to work as a conductor or engineer, but he now argues that he is qualified to return to work in those positions.  This inconsistency weighs in favor of applying judicial estoppel in this case.  I note, however, that the defendant's statement of facts does not indicate that Osborn himself claimed that he would never return to work as an engineer or conductor; rather, he said that his doctors told him that they would not release him to return to work.  (See Def.'s Facts ¶ 6.)  Osborn also described several relatively strenuous tasks that he retained the ability to perform, and he did make one unsuccessful attempt to return to work shortly after his injury.  (Id. ¶¶ 6, 12-13.)  If in Jensen the plaintiff "dramatically emphasized his position" that he would be unable to return to work as an engineer or conductor, evidence indicating as much has not been called to my attention.  See Cook v. Union Pacific R. Co., No. 4:07CV3241, 2008 WL 4540164, at *8 (D. Neb. Oct. 7, 2008).  Furthermore, nearly two years passed between the settlement of the Jensen case and the plaintiff's attempt to return to work at BNSF.  Although the defendant is right to question the remarkable nature of the plaintiff's alleged recovery in light of his physicians' opinions, it nevertheless merits mention that the plaintiff has not harbored two contradictory positions about his condition at a single point in time.

The applicability of the second consideration is more doubtful.  The plaintiff did not persuade a court to adopt his earlier position; instead, his claims against the Jensens were settled.  As the defendant outlines in its thorough brief, the Eighth Circuit has not yet addressed whether a settlement amounts to a "court determination" within the meaning of the second New Hampshire factor, and other circuits are divided on the question.  See Commonwealth Ins. Co. v. Titan Tire Corp., 398 F.3d

879, 887 (7th Cir. 2004) (citing <u>Kale v. Obuchowski</u>, 985 F.2d 360, 361-62 (7th Cir. 1993)) (holding that a favorable settlement may be sufficient to support the application of judicial estoppel); <u>Rissetto v. Plumbers and Steamfitters Local 343</u>, 94 F.3d 597, 604-05 (9th Cir. 1996) (same); <u>In re Bankvest Capital Corp.</u>, 375 F.3d 51, 60-61 (1st Cir. 2004) (holding that a settlement does not amount to court acceptance of a claimant's assertions); <u>Bates v. Long Island R. Co.</u>, 997 F.2d 1028, 1038 (2d Cir. 1993) (same); <u>Blanton v. Inco Alloys Intern., Inc.</u>, 108 F.3d 104, 110 (6th Cir. 1997) (holding that settlement generally implies that there has been no "successful" position for the purposes of judicial estoppel.  (<u>See also</u> Def.'s Br. at 40-41.)  Even if I were to assume that a settlement is sufficient to support the application of judicial estoppel, the extent to which the plaintiff "succeeded" in persuading the Jensens to accept his position is unclear.  In other words, the amount of the settlement, if any, associated with the plaintiff's allegedly permanent restriction from engineer and conductor work is unknown.[12]  I find that the second factor does not weigh in favor of the application of judicial estoppel.

With respect to the third factor, the defendant argues that it relied on the plaintiff's own medical evidence stating that he was permanently restricted from working as an engineer or conductor, and it would be unfair to allow the plaintiff to hold BNSF liable because of that reliance. (Def.'s Br. at 42-43.)  This argument is persuasive, and I find that it weighs in favor of the application of judicial estoppel here.

On balance, however, I am not persuaded that judicial estoppel ought to be applied.  The threat to the integrity of the judicial process posed by the shift in the plaintiff's position is not so great that estoppel is warranted.

**E.    Whether the Plaintiff's Claim Is Barred Under the Doctrine of Equitable Estoppel**

The defendant argues that the plaintiff should be equitably estopped from denying that he is permanently restricted from returning to work at BNSF as a conductor or engineer.  (Def.'s Br. at 43-48.)  "The principle of [equitable] estoppel declares that a party who makes a representation

---

[12] Although the defendant submits that "[t]he case would not have settled for $850,000 if the Jensens had not believed Osborn's position that he would never sufficiently recover from his injuries to the extent needed to allow him to return to his position of engineer or conductor," (Def.'s Br. at 41), there is no support for this statement in the record.

22

that misleads another person, who then reasonably relies on that representation to his detriment, may not deny the representation." <u>Duty v. Norton-Alcoa Proppants</u>, 293 F.3d 481, 493-94 (8th Cir. 2002) (quoting <u>Farley v. Benefit Trust Life Ins. Co.</u>, 979 F.2d 653, 659 (8th Cir. 1992)).

I am not convinced the equitable estoppel is appropriate here. Although it is true that the plaintiff has changed his position on the question of whether he is permanently disabled from working as a conductor or engineer, it is not clear that he misrepresented his condition at any time. Also, although it is true that the defendant relied on the opinions of the plaintiff's treating physicians when issuing its restrictions for the plaintiff, it was the defendant who requested that the plaintiff come forward with evidence demonstrating that those restrictions should be lifted. As set forth in Part I above, Dr. Clark invited the plaintiff to submit new medical evidence dating to 2005, and she represented that she might alter the plaintiff's restrictions based on this new evidence. (Def.'s Index, Ex. 3, Hr'g Ex. 3 at 1, ECF No. 28-2.) The plaintiff made a number of efforts to provide such evidence, but Dr. Clark later reversed herself, stating that she could think of nothing that the plaintiff could provide that would convince her to alter the 2004 restrictions. (Def.'s Index, Ex. 2, Tr. at 315, ECF No. 27-2.) The defendant now claims that the plaintiff should be estopped from ever denying those restrictions, despite the fact that BNSF originally encouraged the plaintiff to submit evidence of his changed medical condition. I cannot accept that argument.

The defendant made a conscious decision to reject the plaintiff's evidence based on all the information that was available. I do not see that the plaintiff concealed any information from the defendant, nor do I see that BNSF was misled into rejecting the plaintiff's efforts to establish that he could return to work. Equitable estoppel is not appropriate.

**IT IS ORDERED** that:

1)      the plaintiff has no viable "reasonable accommodation" claims, but the defendant's motion for summary judgment, ECF No. 25, is otherwise denied; and

2)      the defendant's motion to strike, ECF No. 48, is granted.

Dated April 11, 2011.

BY THE COURT


s/ Warren K. Urbom
United States Senior District Judge